IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF PENNSYLVANIA

| | |
|---|---|
| MITCHELL AND RANDI SCHWARTZ, AND EDWARD AND MARY BURNSIDE on behalf of themselves and all others similarly situated,<br><br>Plaintiffs,<br><br>v.<br><br>LAWYERS TITLE INSURANCE COMPANY,<br><br>Defendant. | CIVIL ACTION NO. 09-841 |

**OPINION**

Slomsky, J.                                                                                                     August 30, 2013

**I.        INTRODUCTION**

The matter before the Court arises from an alleged fraudulent scheme in which Defendant Lawyers Title Insurance Company ("Lawyers"), through various title agents, misrepresented the amount of money due and owing for title insurance. According to Plaintiffs, unsuspecting homeowners who secured mortgages and paid for title insurance were defrauded through the pervasive scheme. On February 26, 2009, Plaintiffs commenced this action to recover the wrongfully obtained funds. On November 5, 2012, after a period of delay in this case, Plaintiffs eventually filed their Second Amended Complaint ("SAC") (Doc. No. 65).[1]

---

[1] Also before this Court are two related cases, Levine v. First American Title Ins. Co., Civil Action No. 09-842, and Coleman v. Commonwealth Land Title Ins. Co., Civil Action No. 09-679, in which similar claims are made. Plaintiffs in all three cases are represented by the same counsel. Plaintiffs in Levine and Coleman also filed Motions to Dismiss the Second Amended Complaint, making the same claims as Plaintiffs in this case. The Court has issued three similar opinions on the Motions to Dismiss in these cases, changing only the names of the parties in the appropriate places.

1

Currently before the Court is Defendant's Motion to Dismiss Count One of the SAC pursuant to Federal Rule of Civil Procedure 12(b)(6) (Doc. No. 67). Count One alleges that Lawyers violated the Racketeering Influenced and Corrupt Organization Act, 18 U.S.C. § 1962(c) (2000) ("RICO"), through the fraudulent scheme. On December 21, 2012, Plaintiffs filed a Response in Opposition to Defendant's Motion to Dismiss (Doc. No. 71), and on January 18, 2013, Defendant filed a Reply (Doc. No. 77). On February 15, 2013, a hearing was held on the Motion to Dismiss, and on April 19, 2013, both parties filed supplemental briefs (Doc. Nos. 84, 85). This matter is now ripe for disposition. For reasons that follow, the Court will deny Defendant's Motion to Dismiss Count One of the SAC.

## II.    BACKGROUND

Plaintiffs allege that Lawyers engaged in a pervasive pattern of overcharging for title insurance inconsistent with statutory rates. In this Court's original Opinion denying the Motion to Dismiss, the allegations were summarized as follows:

> The Amended Complaint describes a scheme to defraud that begins when title insurance is applied for and ends when funds are disbursed to the title insurance company at settlement. The Amended Complaint alleges that the relationship between Lawyers and each title agent is governed by an agency agreement. The agreement states the conditions under which the title agent is authorized to issue title insurance on behalf of Lawyers. Title agents are authorized to act as settlement agents at closing, to

---

All three cases were originally filed in February 2009. Defendants filed Motions to Dismiss the complaints, challenging in part whether they properly allege each element of a RICO violation. On January 14, 2010, the Court issued an Opinion and Order denying the Motion to Dismiss (Doc. No. 31). Thereafter, Defendant moved to stay this case pending the outcome of White v. Conestoga Title Ins. Co., 53 A.3d 720 (P.a. 2012), in which the Supreme Court of Pennsylvania agreed to decide whether matters related to the insurance aspect of these cases should be litigated through the administrative remedy provided in 40 Pa. Cons. Stat. § 910-44(b). White was not before this Court, but the outcome affected in part the threshold question of subject matter jurisdiction in this Court. Therefore, a stay was issued. On August 20, 2012, the Supreme Court of Pennsylvania decided White and held that Plaintiffs may proceed with their RICO claim and their claim under the Pennsylvania Unfair Trade Practices and Consumer Protection Law ("UPTCPL"), though not with common law claims.

> conduct closings of refinance transactions on behalf of Defendant, to prepare relevant documents on behalf of Defendant, and to collect the premium for the benefit of Defendant. Plaintiffs assert that Defendant provides title closing software used by the title agents. As noted, this case charges that Defendant and its agents engaged in a fraudulent scheme by deliberately misrepresenting the correct amount of money due and owing for title insurance, misappropriating the overcharges, and failing to disclose to purchasers of title insurance that they were entitled to discounts if the property was refinanced and title insurance was purchased within ten years.

(Doc. No. 30 at 8) (internal citations omitted.)

In the SAC, Plaintiffs bring two claims against Lawyers. In Count One, Plaintiffs allege a RICO violation with mail and wire fraud as the predicate offenses. In Count Two, Plaintiffs claim Defendant employed unfair or deceptive acts prohibited by the Pennsylvania Unfair Trade Practices Act and Consumer Protection Law ("UTPCPL"). Defendant moves only to dismiss Count One, challenging in part whether the facts pled in the SAC establish a valid "enterprise" under 18 U.S.C. § 1961(4).

Plaintiffs assert that three alternative RICO enterprises were utilized in furtherance of the fraudulent claims. The first is a "hierarchical" enterprise, also referred to as a "pyramid" structure, which is described as follows:

> With respect to Lawyers, at all relevant times there has been and continues to be an association-in-fact enterprise within the meaning of 18 U.S.C. § 1961(4). This enterprise consists of at least Lawyers and its Title Agents/settlement agents. At all relevant times this enterprise has been and continues to be engaged in selling title insurance, an activity that affected and continues to affect interstate commerce.

(Doc. No. 65 ¶58.) The second enterprise is comprised of multiple bilateral associations between Lawyers and each of its title agents. The SAC describes this enterprise as follows:

> In the alternative, Defendant has conducted the affairs of multiple bilateral association-in-fact RICO enterprises through a pattern of racketeering activity. The enterprises are the bilateral associations

3

> in fact of Defendant and each of its Pennsylvania title agents, including the title agents involved in Plaintiffs' transactions. The enterprises are governed by written agency agreements that make Defendant the principal, are intended to market title insurance in Pennsylvania, among other objects, and have the structure, continuity and purpose sufficient to constitute an enterprise under RICO. Defendant has conducted the affairs of these enterprises through the pattern of racketeering activity described elsewhere in this amended complaint, including knowingly providing the computer software, financial support and legal protection used to perpetrate the frauds on homeowners refinancing their mortgages.

(Id. ¶59.) Finally, the third enterprise is described as multiple single entity enterprises consisting only of the title agents themselves. This enterprise is describes in paragraph 60 of the SAC:

> In the alternative, Defendant has conducted the affairs of multiple single entity RICO enterprises through a pattern of racketeering activity. The single entity enterprises are Defendant's Pennsylvania title agents, including the title agents involved in Plaintiffs' transactions. These enterprises are legal entities such as corporations, partnerships, sole proprietorships. Defendant controls these enterprises through written agency agreements that make Defendant the principal. Defendant conducts the affairs of these enterprises through the pattern of racketeering activity described elsewhere in the amended complaint, including knowingly providing the computer software, financial support and legal protection used to perpetrate the frauds on homeowners refinancing their mortgages.

(Id. ¶60.) The sufficiency of these "enterprise" allegations is challenged by Defendant in this case.

## III. STANDARD OF REVIEW

As noted, Defendant Lawyers moves to dismiss Count One against it for the failure to state a claim upon which relief can be granted under Federal Rule of Civil Procedure 12(b)(6). In deciding a motion to dismiss pursuant to Rule 12(b)(6), a court must "accept all factual allegations as true, construe the complaint in the light most favorable to the plaintiff, and determine whether, under a reasonable reading of the complaint, the plaintiff may be entitled to relief." Phillips v. Cnty. of Allegheny, 515 F.3d 224, 233 (3d Cir. 2008) (reasoning that this

statement of the Rule 12(b)(6) standard remains acceptable following the U.S. Supreme Court's decision in Bell Atlantic Corp. v. Twombly, 550 U.S. 554 (2007)) (internal quotations omitted).

Under Aschcroft v. Iqbal, 556 U.S. 662 (2009), it is clear that "threadbare recitals of the elements of a cause of action, supported by mere conclusory statements do not suffice" to defeat a Rule 12(b)(6) motion to dismiss. Id. at 663; see Bell Atl. Corp. v. Twombly, 550 U.S. 544 (2007). Applying the principles of Iqbal and Twombly, the Third Circuit in Santiago v. Warminster Township, 629 F.3d 121 (3d Cir. 2010), set forth a three-part analysis that a district court in this Circuit must conduct to evaluate whether allegations in a complaint survive a 12(b)(6) motion to dismiss:

> First, the court must "tak[e] note of the elements a plaintiff must plead to state a claim." Second, the court should identify allegations that, "because they are no more than conclusions, are not entitled to the assumption of truth." Finally, "where there are well-pleaded factual allegations, a court should assume their veracity and then determine whether they plausibly give rise to an entitlement for relief."

Id. at 130 (quoting Iqbal, 556 U.S. at 675, 679). "This means that our inquiry is normally broken into three parts: (1) identifying the elements of the claim, (2) reviewing the complaint to strike conclusory allegations, and then (3) looking at the well-pleaded components of the complaint and evaluating whether all of the elements identified in part one of the inquiry are sufficiently alleged." Malleus v. George, 641 F.3d 560, 563 (3d Cir. 2011).

A complaint must do more than allege a plaintiff's entitlement to relief, it must "show" such an entitlement with its facts. Fowler v. UPMC Shadyside, 578 F.3d 203, 210-11 (citing Phillips v. Cnty. of Allegheny, 515 F.3d 224, 234-35 (3d Cir. 2008)). "[W]here the well-pleaded facts do not permit the court to infer more than the mere possibility of misconduct, the complaint has alleged — but it has not 'shown' — 'that the pleader is entitled to relief.'" Iqbal, 556 U.S. at

5

679. The "plausibility" determination is a "context-specific task that requires the reviewing court to draw on its judicial experience and common sense." Id.

## IV. ANALYSIS

### A. Plaintiffs' RICO Claim May Proceed Since It Gives Rise to a Plausible Inference of an Association-in-Fact Enterprise.

#### 1. Plaintiffs Adequately Pled a Hierarchical Association-in-Fact Enterprise.

Defendant's primary argument is that Plaintiffs fail to state a hierarchical association-in-fact enterprise, the first one alleged in the Complaint, because a relationship does not exist between the title agents. As previously noted, Plaintiffs make factual allegations in the SAC to show the existence of a hierarchical enterprise consisting of Lawyers and the title agents. (Doc. No. 65 ¶58.) Lawyers states in the Motion to Dismiss that the SAC suffers from "a fatal flaw – the absence of a single allegation that the hundreds of independent title agents across Pennsylvania who comprise this supposed enterprise have **any** relationship with one another." (Doc. No. 84 at 7 (emphasis in original).) The Court is persuaded, though, that Plaintiffs' RICO claim should be allowed to proceed because as pled Plaintiffs have set forth facts giving rise to the plausible inference of an association-in-fact hierarchical enterprise. Moreover, the "fatal flaw" relied on by Defendant does not apply to this kind of enterprise.

To state a claim under § 1962(c), Plaintiffs must allege that a "person" employed by or associated with an "enterprise" engaged in the following activity: "(1) conducted (2) an enterprise (3) through a pattern (4) of racketeering activity."[2] Lum v. Bank of Am., 361 F.3d 217, 223 (3d Cir. 2004) (citations omitted). "'Enterprise' includes any individual, partnership,

---

[2] The only element of § 1962(c) challenged by Defendant in the Motion to Dismiss is the "enterprise" element.

6

corporation, association, or other legal entity, and any union or group of individuals associated in fact although not a legal entity." 18 U.S.C. § 1961(4). As the Third Circuit has explained:

> [w]hen the enterprise asserted is a legal identity, such as "a legitimate business or organization …, the need to allege and prove the existence of enterprise structure can be met without great difficulty, since all aspects of the enterprise element … are satisfied by the mere proof that the entity does in fact have a legal existence." 2007 WL 2892700, at *9; see e.g., Webster v. Omnitrition Int'l Inc., 79 F.3d 776, 786 (9th Cir. 1996) ("[C]orporate entities ha[ve] a legal existence …, and the very existence of a corporation meets the requirement for a separate [enterprise] structure." (internal quotation marks omitted) (alteration in original)); see also Boyle v. United States, 556 U.S. 938 (2009) (Stevens, J., dissenting) ("In cases involving a legal entity, the matter of proving the enterprise element is straightforward…"). The statutory language does not, however, specify the essential features of an association-in-fact enterprise.

In re Insurance Brokerage Antitrust Litigation, 618 F.3d 300, 364 (3d Cir. 2010). Since the hierarchical structure noted above is an association-in-fact enterprise rather than a legal entity enterprise, the case law elucidates the requirements for such an "association-in-fact" enterprise.[3]

In United States v. Turkette, 452 U.S. 576, 583 (1981), the Supreme Court held that an association-in-fact enterprise is proven by a showing that: (1) there exists an ongoing organization, formal or informal; (2) the various associates of the organization function as a continuing unit; and (3) the organization has an existence separate and apart from the alleged pattern of racketeering activity. Boyle v. United States, 556 U.S. 938, 940 (2009), expanded on these requirements and held that an association-in-fact enterprise must have three structural features: "a purpose, relationships among those associated with the enterprise, and longevity sufficient to permit these associates to pursue the enterprise's purpose." While the group must function as a continuing unit, it is not required to have a particular type of organizational

---

[3] Although the components of this enterprise are legal entities themselves, Lawyers and the title agents, they can still be combined to form an association-in-fact enterprise as alleged here.

7

structure. The statute is satisfied by an enterprise "whose associates engage in spurts of activity punctuated by periods of quiescence." Id. This comports with the legislative intent for a broad construction of the enterprise definition. H.J., Inc. v. Nw. Bell Tel. Co., 492 U.S. 229, 248-49 (1989) ("Congress drafted RICO broadly enough to encompass a wide range of criminal activity, taking many different forms and likely to attract a broad array of perpetrators operating in many different ways. It would be counterproductive and a mismeasure of congressional intent now to adopt a narrow construction. . ."). In addition, Plaintiffs may allege alternative enterprise theories in their complaint without limit. United States v. Stratton, 649 F.2d 1066, 1075 (5th Cir. 1981).

During the pendency of this case, the Third Circuit decided In re Insurance Brokerage Antitrust Litigation, 618 F.3d 300 (3d Cir. 2010), further outlining the requirements of an association-in-fact enterprise.[4] In Insurance Brokerage, purchasers of commercial and employee benefit insurance brought an action against insurers and insurance brokers, claiming unlawful schemes under the RICO statute to allocate purchasers among particular groups of insurers. The purchasers alleged two types of association-in-fact enterprises seemingly relevant to the case at hand. First, the purchasers alleged a number of "broker-centered" enterprises, in which brokers colluded with their insurer-partners to deceptively steer clients to preferred insurer-partners in exchange for contingent commission payments. Second, the purchasers alleged a "Marsh-centered" enterprise, in which insurer-broker Marsh & McLennan ("Marsh") solicited false bids on policies and received improper contingent commission payments in exchange for steering business to a select group of insurers. Defendants moved to dismiss the complaint for failure to

---

[4] In the Insurance Brokerage case, the plaintiffs made two claims. One claim consisted of an antitrust violation under the Sherman Act, 15 U.S.C. § 1 (2004). The second claim was for a violation of the RICO statute, in which the court considered the sufficiency of the RICO enterprises that were alleged. The court's analysis on the RICO claim is relevant here.

8

state a valid association-in-fact enterprise. The Third Circuit held that while the broker-centered enterprise did not meet the requisites of a valid RICO enterprise, the Marsh-centered enterprise did. Notably, the Insurance Brokerage complaint did not plead alternative bilateral or single-entity enterprises, as are alleged in the SAC in this case. As the Third Circuit noted:

> As the District Court acknowledged, although the complaints do not adequately plead these asserted broker-centered enterprises, it is possible that plaintiffs' factual allegations would provide a plausible basis for the assertion of a number of bilateral enterprises, each encompassing a broker and one of its insurer partners, or even the assertion that individual brokers or insurers each constituted an enterprise.

Id. at 376. That the court did not find sufficient the allegations on the broker-centered enterprise did not mean that the same facts would not give rise to bilateral or single entity RICO enterprises.

In deciding what constituted an association-in-fact enterprise, the court in Insurance Brokerage explained that in Boyle, the court held that an enterprise does not require a formal structure or a systematic plan. Id. at 377. Instead, enterprise decisions may be made on an ad hoc basis by any number of methods, so long as the enterprise consists of a group with a common purpose and course of conduct. Id. at 365, 377. (citing Turkette, 452 U.S. at 583.) Moreover, in Insurance Brokerage, the court noted that "proof of a pattern of racketeering activity may be sufficient in a particular case to permit a jury to infer the existence of an association-in-fact enterprise." Id. (citing Boyle, 556 U.S. at 951.)

In Insurance Brokerage, the broker-centered scheme created a "hub and spoke" enterprise with the brokers as the hub and the insurance companies as the spokes. The court held that this alleged enterprise lacked a "unifying rim" in the form of collaboration among the insurer-partners. In short, the allegations implied parallel conduct between the insurers with no common

9

purpose among them, rather than the concerted action as required by Boyle. The facts, therefore, did not support an inference that the insurers associated together in a horizontal agreement for the common purpose of engaging in a course of conduct.

In contrast, the Marsh-centered enterprise did allege a "rim" surrounding the hub-and-spoke configuration. Marsh prepared brokering plans that governed the placement of insurance contracts up for renewal and assigned business to specific insurers at target prices. Id. at 377. This "plausibly evinces an expectation of reciprocity and cooperation among the insurers." Id. at 376. Since Boyle disavowed the need for any particular hierarchical or organizational structure, the members of the scheme were not required to have fixed roles. Instead, the reciprocal bid-rigging adequately suggested relationships among the insurers:

> In our view, the alleged agreement by insurers to provide sham bids plausibly suggests an interrelationship among the insurers – mediated through Marsh – in pursuit of achieving greater business and profits by means of deceiving insurance purchasers. Through this interrelationship, the insurers were allegedly able to advance this common interest to a greater extent than would have been possible on the strength of the bilateral relationships between Marsh and each broker alone.

Id. at 377. Ultimately, the court was satisfied that a relationship based on this reciprocal bid-rigging constituted an association-in-fact enterprise. Id. at 378.

Furthermore, there is no need for a plaintiff to prove that each conspirator had contact with all other members. Indeed, a RICO enterprise may be shown through proof of a hierarchical structure and without evidence that the lower level members of the enterprise collaborated directly with each other. See, e.g., United States v. Friedman, 854 F.2d 535, 562-63 (2d Cir. 1988) ("So long as the alleged RICO co-conspirators have agreed to participate in the affairs of the same enterprise, the mere fact that they do not conspire directly with each other 'does not convert the single agreement to conduct the affairs of an enterprise through a pattern of

racketeering activity into multiple conspiracies.'"); United States v. De Peri, 778 F.2d 963, 975 (3d Cir. 1985) ("This knowledge [of the identities of all other participants] is not essential to the finding of a RICO conspiracy. As we said in Riccobene, '[i]t is well established that one conspirator need not know the identities of all his coconspirators, nor be aware of all the details of the conspiracy in order to be found to have agreed to participate in it.'") (quoting United States v. Riccobene, 709 F.2d 214, 225 (3d Cir. 1983)). Thus, Plaintiffs need not plead additional facts to show communication between the various title agents.

With respect to the first enterprise alleged in the SAC, Plaintiffs describe a hierarchy in which Lawyers and title agent members of the association-in-fact enterprise have defined roles. The facts alleged show that Lawyers directed the title agents in a common scheme to further a common purpose, collecting fees Lawyers was not entitled to receive. Moreover, Lawyers operated an organization through which the title agents conducted activities that included, "the use of systems and procedures for conducting title searches, for collecting and processing payments for title searches and title insurance policies, for issuing policies, and for providing title insurance for lenders and owners." (Doc. No. 65 ¶61.) These activities had the same or similar purpose, and raise an inference that there may have been an expectation of reciprocity and cooperation among the title agents. According to Plaintiffs, Lawyers and the title agents functioned as a continuing unit, with each member performing a role to further the activities of the enterprise, which was to market and sell title insurance and to collect payments for the overcharges. (Id.)

Sufficient facts have also been pled to show that each title agent understood the essential nature of the plan and knowingly agreed to participate in the plan. In addition, similar to Marsh in the Insurance Brokerage case, Lawyers played a distinct role as director of the alleged

racketeering activity. Lawyers was the "unifying rim" for the title agents by acting as a common leader and directing the illicit activities of the title agents. See In re Am. Investors Life Insurance Co. Annuity Mktg. & Sales Practice Litig., 2007 U.S. Dist. LEXIS 64967 (E.D.Pa. Aug. 30, 2007) (finding an association-in-fact enterprise where an insurance company directed its sales agents and attorneys). Whether the first enterprise alleged here is hierarchical as Plaintiffs allege, or a "hub and spoke" enterprise similar to the one between broker Marsh and the insurance companies, the facts in the Complaint are sufficient to support a RICO enterprise.

At this stage of the case, the Court is satisfied that Plaintiffs have met the Boyle standard: Lawyers and its title agents functioned as a continuing unit for the purpose of overcharging on title insurance, with an informal structure within the group for making decisions, and a mechanism for controlling and directing the affairs of the group. Moreover, a relationship existed between Lawyers and the title agents sufficient to show longevity and pursuit of the enterprise's purpose. The fact that there is no claim that the title agents were aware of each other's role in the enterprise does not undermine the viability of the hierarchical enterprise, because, as alleged in the SAC, each title agent had a role in furtherance of the enterprise's affairs. See United States v. Bergrin, 650 F.3d 257, 271 (3d Cir. 2011). Knowledge of one's co-conspirators is not required.

### 2. Bilateral Association-in-Fact Enterprises.

As initially noted, Plaintiffs also assert that Defendant conducted multiple bilateral association-in-fact RICO enterprises between itself and each of its title agents. (Doc. No. 65 ¶59.) Defendant does not argue that bilateral associations may not constitute enterprises and the Court is satisfied that these entities constitute an association-in-fact enterprise. The bilateral entities do not present the same concern regarding the relationships between title agents.

### 3. Single Entity Association-in-Fact Enterprises.

Lastly, Plaintiffs allege in the SAC that Lawyers conducted the affairs of multiple single entity RICO enterprises, consisting of the title agents themselves. (Doc. No. 65 ¶60.) The title agents are legal entity enterprises and fall squarely within the RICO enterprise definition of any "individual, partnership, corporation, association, or other legal entity." 18 U.S.C. § 1961(4). The Court is likewise satisfied that these single entity enterprises are appropriate RICO enterprises.

### B. Plaintiffs Have Satisfied the Specificity Standard under Rule 9(b).

Next, Defendant argues that the purported bilateral and single entity enterprises do not satisfy the specificity standard under Rule 9(b) because the claims do not state the date, place, or time of the fraud. (Doc. No. 84 at 24.) The Court disagrees.

In order to pursue a RICO suit based upon predicate acts of mail and wire fraud, a plaintiff must meet the heightened pleading requirement of Rule 9(b), which states that "a party must state with particularity the circumstances constituting fraud." Fed. R. Civ. P. 9(b). The purpose of the heightened pleading requirement is to "place the defendants on notice of the precise misconduct with which they are charged, and to safeguard defendants from spurious charges of immoral and fraudulent behavior." Seville Indus. Machinery Corp. v. Southmost Machinery Corp., 742 F.2d 786, 791 (3d Cir. 1984).

Here, the SAC describes the predicate acts, when the overcharging of Plaintiffs for insurance occurred, the amount of the overcharge, and the elements of the RICO violation with enough specificity to comply with the requirements of Rule 9(b). Although Plaintiffs do not allege who specifically made misrepresentations to whom, Plaintiffs include many other details to "inject precision or some measure of substantiation into [their allegations of fraud]. Frederico

v. Home Depot, 507 F.3d 188, 200 (3d Cir. 2007) (quoting Lum, 361 F.3d at 223). Examining the allegations set forth in the SAC, it is clear that Lawyers is "on notice of the precise misconduct with which they [were] charged." Seville, 742 F.2d at 791. The Court is satisfied that Plaintiffs' claims should proceed against Lawyers.

### C. Plaintiffs Have Standing to Pursue Claims Based on Bilateral and Single Entity Enterprises.

Defendant also contends that Plaintiffs lack standing to pursue claims based on bilateral or single entity enterprises. Defendant's primary argument is that Plaintiffs only have standing to sue when the title agent from whom they secured title insurance is included in the enterprise. (Doc. No. 84 at 20.)

Under 18 U.S.C. § 1964(c), "any person injured in his business or property by reason of a violation of section 1962 of this chapter may sue therefor in any appropriate United States district court . . . ." In order to have RICO standing under this section, a plaintiff must be injured in his business or property by reason of a RICO offense. The complaint must allege injury to one's business or property as a proximate result of any predicate act of racketeering by the defendant. Sedima, S.P.R.L v. Imrex Co., Inc., 473 U.S. 479, 495-97 (1985). The Third Circuit has held that "the injury which confers standing on a RICO plaintiff is injury flowing from the commission of the predicate act, not injury flowing from the pattern of such acts." Town of Kearny v. Hudson Meadows Urban Renewal Corp., 829 F.2d 1263, 1268 (3d Cir. 1987). "Reading into the statute the requirement that a civil plaintiff prove injury from the entire pattern rather than from any predicate act would, we believe, be inconsistent with the core congressional purposes behind the enactment." Id. at 1268. Further, "a plaintiff is permitted to plead 'multiple schemes' which are not necessarily directed at that party, so long as one act injures the plaintiff

14

and creates standing for it to sue." Kiseno Trade & Inv. Ltd. v. DEV Lemster, 2011 U.S. Dist. LEXIS 133089, at *20 (W.D. Pa. Sept. 27, 2011).

Here, as noted, Defendant contends that Plaintiffs have no standing under RICO to allege violations predicated on an enterprise which does not include a title agent from whom Plaintiffs secured insurance. This argument would apply to both the multiple bilateral associations between Lawyers and each of its title agents, and to the multiple single entity enterprises consisting only of the title agents themselves. In accordance with the authority cited above, as long as Plaintiffs have established an injury from a predicate act they have RICO standing. The Complaint precisely describes the predicate acts directed at Plaintiffs and how they were injured by these fraudulent acts to give them standing. This standing permits them to plead multiple enterprises.[5]

## V. CONCLUSION

For the foregoing reasons, the Court will deny Defendant Lawyers' Motion to Dismiss Count One in its entirety. An appropriate Order follows.

---

[5] Plaintiffs' standing as a party injured under RICO may also afford them standing to pursue RICO violations on behalf of other consumers who were injured by the actions of Defendant.

Defendant argues in the Motion to Dismiss that Plaintiffs have no standing to represent a class of the purchasers of title insurance. Whether Plaintiffs are a proper party to represent the class will be decided when the parties litigate the class action status of this case.